UNTIED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
PIKEVILLE DIVISION
CIVIL ACTION NO. 7:22-CV-00007-REW-EBA


SABRINA ADKINS, ET AL                        PLAINTIFFS


VS:        DEPOSITION OF MICKEY STINES

BEN FIELDS, ET AL                            DEFENDANTS


                * * * * * * * * * * *

        The Deposition of MICKEY STINES was taken

on behalf of the Plaintiffs on September 16, 2024 at

the Law Offices of Ned Pillersdorf, 124 West Street,

Prestonsburg, Kentucky.

        Said deposition was taken pursuant to

notice, previously filed, and is to be used for

purposes of discovery and all other purposes

permitted by the Rules of Civil Procedure.

APPEARANCES

ON BEHALF OF PLAINTIFF:

          HON. BETHANY BAXTER
          201 WEST SHORT STREET, STE 300
          LEXINGTON, KY 40507
          bethanybaxter@jchilderslaw.com

          HON. NED PILLERSDORF
          124 WEST STREET
          PRESTONSBURG, KY 41653


ON BEHALF OF DEFENDANTS:

          HON. JONATHAN SHAW
          P.O. DRAWER 1767
          PAINTSVILLE, KY 41240
          jshaw@psbb-law.com

          HON. DANIEL DOTSON
          178 MAIN STREET, STE 1
          WHITESBURG, KY 41858

          VIA ZOOM

          HON. JASON WILLIAMS
          303 SOUTH MAIN STREET
          LONDON, KY 41743
          jason@wftlaw.com


          HON. DON JONES
          P.O. BOX 276
          PAINTSVILLE, KY 41240
          don@djoneslawoffice.com


ALSO PRESENT:      VIA ZOOM

          SABRINA ADKINS

INDEX

CAPTION PAGE . . . . . . . . . . . . . 1

APPEARANCES . . . . . . . . . . . . 2

INDEX . . . . . . . . . . . . . . . 3

DIRECT EXAMINATION BY:

    HON. BETHANY BAXTER . . . . . . . 4-191

CROSS- EXAMINATION BY:

    HON. JASON WILLIAMS . . . . . . .192-193

CROSS-EXAMINATION BY:

    HON. JONATHAN SHAW . . . . . . . 194-195

REPORTER'S CERTIFICATE. . . . . . . . 196

Plaintiff's Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, and 24

Defendant's Exhibits 1, 2 and 3

1    WHEREUPON, MICKEY STINES, THE WITNESS, HAVING

2    BEEN DULY SWORN BY THE COURT REPORTER, WAS EXAMINED

3    AND TESTIFIED AS FOLLOWS:

4                    **DIRECT EXAMINATION**

5    **MS. BAXTER**

6    Q        Sheriff Stines, my name is ███████████ .

7             I represent Sabrina Adkins ███████████

     ████████████████        in this case, ████████

     █████████████████████████████████████████

     ████████████████████████████████████████████

     █████████████████████████████

     █   █████████████████████████████████████

         ██████████████████

     █   ███████████████████████████████████

     █   █████████████████

     █   ██████████████████████████████████████

         ███████████████████████████████████████

         ██████████████████████████████████████

         ████████████████████████████████████

         █████████████████████████████████████████

         █████████████████████████████████████████

         ███████████████████████████████████████

         ██████████████████████████████████████████

         ████████████████████████████████████████

         ███████████████████████████████████████



[REDACTED]

16    Q        Where were you born and raised?

17    A        Born in Whitesburg, Kentucky.

[REDACTED]

20    Q        Okay. Where did you grow up?

21    A        I grew up in Fleming Neon.

22    Q        Okay. I don't think that I asked you.  Will

23             you state your full name for the record,

24             your legal name?

25    A        Yes.  Shawn Mickey Stines.

5    Q     And how long did you live in Fleming Neon?

6    A     19 years.

7    Q     Then, where did you move after you left

8           Fleming Neon?

9    A     McRoberts.

10   Q     Did you move there with your parents or did

11         you move there by yourself?

12   A     My wife.

13   Q     So you got married at 19 years old?

14   A     Actually when we moved there, we wasn't

15         married.

16   Q     Okay. What is your wife's name?

17   A     Caroline Stines.

22   Q     Okay. How old are you?

23   A     I am 43.

So did you go to college?

11    A    Southeast Community College.

12    Q    There in Whitesburg?

13    A    Yes.

14    Q    Okay. Did you graduate from Fleming Neon

15         High School?

16    A    Yes.

17    Q    What did you study at Southeast?

18    A    Just basics. I only got 26 hours.

19    Q    Okay. And where you going to school full

20         time?

21    A    Yes, and I had a job.

22    Q    Okay. What was your job?

23    A    I worked at Neon BP.

24    Q    Okay. What was your employment after you

25         left Southeast Community College?

| | | |
|---|---|---|
| 1 | A | Well, it was the Neon BP for a little |
| 2 | | while. |
| 3 | Q | Okay. What about after that? |
| 4 | A | I went to the Fleming Neon Police |
| 5 | | Department. |
| 6 | Q | Okay. What year did you start with the |
| 7 | | Fleming Neon Police Department? |
| 8 | A | 2001, I believe. |
| 9 | Q | How long did you work at the Fleming Neon |
| 10 | | Police Department? |
| 11 | A | Seven months. |
| 12 | Q | Why did you leave that job? |
| 13 | A | Cut backs. |
| 14 | Q | What was your position with the Fleming |
| 15 | | Neon Police Department? |
| 16 | A | I was a Patrol Officer. |
| 17 | Q | Okay. So cut backs, you lost your job. |
| 18 | | What did you do after that? |
| 19 | A | I drew unemployment for some time, I don't |
| 20 | | know exact date. |
| 21 | Q | What after that? |
| 22 | A | I went to work for the sheriff's office. |
| 23 | Q | Okay. Who was the sheriff when you went to |
| 24 | | work for the sheriff's office? |
| 25 | A | Steve Banks. |

| | | |
|---|---|---|
| 1 | Q | Steve Banks. And what year would that have |
| 2 | | been? |
| 3 | A | 2002. |
| 4 | Q | Was the training that you received as a |
| 5 | | deputy sheriff different from the training |
| 6 | | that you received as a patrol officer? |
| 7 | | Do you want me to repeat the question? |
| 8 | A | Yeah. |
| 11 | Q | Do you have to go to the academy as a |
| 12 | | police officer? |
| 13 | A | Yes. |
| 14 | Q | And so that the same academy you would go |
| 15 | | to as a new deputy sheriff? |

1       ████████████████         They couldn't send me to

2       the academy, so I actually never attended.

3   Q   Okay. So did you attend the academy in 2002

4       when you went to work for the Letcher

5       County Sheriff's Office?

6       ██████  █████████████████

7       ████████████████████████████

8       ███████  █████████████████

9       ██

10      █████  ██████████████████

11      █████████████████████

12  █    ████████████████

13  A   So the deputy sheriff has an academy that

14      20 weeks long.  Court Security officers

15      have an academy that is two weeks, and you

16      have different types of training for both.

17      So when I was initially hired for Steven

18      Banks, they put me through Pre-POPS, and I

19      was about to work the road and work the

20      court and stuff.

21  Q   Okay. So you did both the deputy training

22      and the CSO training?

23  A   I have never attended the academy that is

24      what you first asked when I first with - -

25      You have got a year to attend.

1    Q        Okay.

2    A        After that I worked for Steven Banks for

3             seven months, Danny Webb came in.  I worked

4             the road and court for Danny. During that

5             time, Danny comes to me and says you says,

6             do you want to be a road officer or court

7             officer, and I said I will be court

8             security. And he said we can get you

9             grandfathered in and I had to take all of

10            their steps to be a court security officer.

███  █        ████████████████████

███  █        ██████████████████████████

███  █        ██████████████████████████

███  █        ██████

███  █        ████

███  █        █████████████████████████

███           █████████████████████

18   A        When I originally went for Neon, I had to

19            take all of the Pre-POPS that is the

20            fitness.

███        ████████  ████████████████████████

███        ███

███  █        ██████████

24   A        Once you do that, you can take the other

25            training at the academy.  Neon laid me off,

| | | |
|---|---|---|
| 1 | | and I didn't get to go to that one. |
| 2 | Q | Okay. That makes sense. So did you end up |
| 3 | | doing that training after you went to |
| 4 | | Letcher County Sheriff's Office? |
| 5 | A | Not the full 20 week academy, no, ma'am. |
| 6 | Q | Why not? |
| 7 | A | The position that they put me in the state |
| 8 | | didn't require me to attend that. |
| 9 | Q | And what was that position? |
| 10 | A | Court security officer. |
| 11 | Q | That is helpful. So then, when Webb came in |
| 12 | | seven months later, I think that I |
| 13 | | understood you to say that he asked you |
| 14 | | what position that you wanted and what was |
| 15 | | your response to him? |
| 16 | A | When he came in, that was 2003, I believe. |
| 17 | | I worked the road and court security. Years |
| 18 | | later, he asked me do you want to go to the |
| 19 | | academy and I said, no, I am going to stay |
| 20 | | in court, and he said, okay. |

15    Q        ████████████████        I think that I was

16             asking you if you had to do the 20 weeks of

17             deputy training to work the roads?

18    A        Yes.

19    Q        But you did not do that training under

20             Sheriff Banks; correct?

21    A        No.

22    Q        Did you ever get that training under

23             Sheriff Webb?

24    A        No.

25    Q        Okay. Did you get that training after that

1    you became sheriff?

2    A    No.

███  █    ███████████████████████████

     █    ██████████████████

     ████████  ███████████████████████████

     ██████████

7    Q    Letcher County Sheriff's Deputy Court

8         Security Officer. You said that you started

9         in 2003; correct?

10   A    No. 2002.

11   Q    2002, okay, correct. Was that until that

12        you became sheriff?

13   A    Yes, that was - - I took over in 2019, the

14        election was in 2018.

15   Q    Okay. And we will come back to some of that

16        in a minute. Any other jobs that you have

17        held prior to 2019?

18   A    Yeah, I worked for East Kentucky

19        Correctional Services.

20   Q    Okay. Aside from that, any other positions?

21   A    I was a security guard at the hospital.

22   Q    Okay. Any other positions besides that?

23   A    At one time, I was a drug sample gatherer

24        for Drug Court.

███  █         ████████████████████████



21  Q    Have you ever been accused of work place

22       sexual harassment or sex discrimination?

23  A    No.



24    Q    Have you ever in

25         your capacity as sheriff, have you ever

```
 1              investigated a complaint of sexual

 2              harassment or sexual misconduct?
```



```
21    Q        So have you ever been responsible for

22             conducting such an investigation?

23    A        This is the only one.

24    Q        Okay.

25    A        I immediately reported it, took action,
```



1    reported it to the State Police, they

2    declined, and I talked to the Commonwealth

3    Attorney, the County Attorney.

2   Q        You became aware at some point that Ben

3            Fields had been accused of sexual

4            misconduct while he was a Letcher County

5            sheriff's deputy; correct?

6   A        Yes.

7   Q        Has there ever been some other instance

8            while you were sheriff that you became

9            aware of a similar allegation related to

10           some other employee?

17  A        Yeah, to the best of my knowledge, I don't

18           recall.

| | | |
|---|---|---|
| 12 | Q | I want to get a better feel for your job |
| 13 | | duties with East Kentucky Correction |
| 14 | | Solutions.  Am I correct that you worked, |
| 15 | | and I am going to call it EKCS today for |
| 16 | | short, you worked for EKCS at the same time |
| 17 | | that you were a deputy sheriff; correct? |
| 18 | A | Yes. |
| 19 | Q | Okay. How did you come to get that job? |
| 20 | A | Judge Wood and Harold Bolling. |
| 21 | Q | Who are they? |
| 22 | A | Judge James T. Wood, and County Attorney |
| 23 | | Harold Bolling. |
| 24 | Q | Was Wood District or Circuit? |
| 25 | A | District. |

| | | |
|---|---|---|
| 1 | Q | Did they offer you the job? |
| 2 | A | They came to me and said we got a job |
| 3 | | opportunity for you house arrest, if you |
| 4 | | want it. |
| 5 | Q | Okay. Do you know why they were the ones to |
| 6 | | approach you about that job? |
| 7 | A | I guess because they work that court.  They |
| 8 | | had already worked that court before I even |
| 9 | | started working there, and they needed |
| 10 | | somebody. |
| 11 | Q | Okay. Did they work for EKCS themselves? |
| 12 | A | No, no, ma'am. |
| 13 | Q | Okay. So who was the first person with EKCS |
| 14 | | who you met? |
| 15 | A | Was Patty. |
| 16 | Q | Okay. And what do you recall about that |
| 17 | | initial meeting? |
| 18 | A | I had to go to Pikeville and take some |
| 19 | | training. |
| 20 | Q | What kind of training? |
| 21 | A | She basically brought me in and showed me |
| 22 | | all of the paperwork and showed me how to |
| 23 | | hook everything up, showed me how all of |
| 24 | | the equipment worked, how to put the leg |
| 25 | | strap together with the clamps. I believe |

```
 1              that was it.

 2   Q          Okay. And I believe Ms. Stockham, Patty

 3              Stockham, testified that you worked for

 4              EKCS for about 20 years; does that sound

 5              correct?

 6   A          No.

 7   Q          How long did you work for EKCS?

 8   A          14 TO 16 approximately.

 9   Q          Years?

10   A          Yes.

     ███  █      ████████████████████████████████████

     ███  █      ██████████████████████████

     ███  █      █████████████████████

14   Q          ████      How were you paid for that work?

15   A          Contract labor, I believe once a month I

16              would get a certain amount commission, and

17              then at the end of the year, I would get a

18              1099.

19   Q          So you were paid on commission?

20   A          Yes.

21   Q          Do you recall how that commission was

22              calculated?

23   A          Per person that was on I got $3.00 a day,

24              and $25.00 for a hookup.

25   Q          Do you recall roughly how much you would
```

| | | |
|---|---|---|
| 1 | | have made year to year at that job? |
| 2 | A | No. |
| 3 | Q | For example Ben Fields in 2021 made over |
| 4 | | $30,000. Did you ever make that much in a |
| 5 | | single year? |
| 6 | A | Yes. |
| 7 | Q | You did? |
| 8 | A | Yes. |
| 9 | Q | Was that about the average that you would |
| 10 | | make is $30,000? |
| 11 | A | No, it would be different. |
| 12 | Q | Every year.  But you are saying that there |
| 13 | | was years that you made $30,000? |
| 14 | A | Yes. |
| 15 | Q | Okay. So you just described the training |
| 16 | | that you got up in Pikeville when you first |
| 17 | | got hired.  Were you trained on any annual |
| 18 | | basis after that initial training? |
| 19 | A | At one time while I was doing house arrest, |
| 20 | | we got a different type of equipment. She |
| 21 | | came in and trained me on that equipment, |
| 22 | | just the hookup, the process and all of |
| 23 | | that. |
| 24 | Q | Aside from that training, was there any |
| 25 | | additional training you got from EKCS? |

1      A       I don't believe so.

8      Q       So for the folks on home incarceration, was

9              it your responsibility as home

10             incarceration officer to make sure they

11             abided by the terms of the home

12             incarceration?

13     A       The terms of the home incarceration, yes.

14     Q       Okay. And the terms of the home

15             incarceration, who sets those?

16     A       The court and the contract.

17     Q       So the judge can say this person is allowed

18             to go here or there; is that what you mean

19             by that might be in the court order?

20     A       Yes, and the statute.

21     Q       Okay. Anything else that kinda would

22             dictate the terms of someone's home

23             incarceration aside from the statute and

24             the judge's order?

| | | |
|---|---|---|
| 1 | A | I didn't do a lot of them, but judges do |
| 2 | | verbal. |
| 3 | Q | What do you mean by judge's do verbal? |
| 5 | A | So when I have violation, I would report it |
| 6 | | to the judge, and at times, they would say |
| 7 | | put them in jail, and I would call down to |
| 8 | | the jail. |
| 9 | Q | Okay. And would you be the one then to |
| 10 | | transport that person to the jail? |
| 11 | A | A lot of mine was at the courthouse. |
| 12 | Q | So the violation was discussed in the |
| 13 | | presence of the person on home |
| 14 | | incarceration? |
| 15 | A | Yes. |
| 16 | Q | So is that what you mean when you said |
| 17 | | judges did verbal? |
| 18 | A | Yes. |
| 19 | Q | Do you remember signing any kind of |
| 20 | | employment contract with EKCS related to |
| 21 | | your employment with them? |
| 22 | A | What was the question again?  Sorry. |
| 23 | Q | Did you ever sign any kind of employment |
| 24 | | contract or agreement with EKCS related to |
| 25 | | your work for them? |

| | | |
|---|---|---|
| 1 | A | Not to my knowledge, no. |
| 2 | Q | Was it ever the case that  - - During the |
| 3 | | time that you were working for EKCS, were |
| 4 | | you also the court security officer? |
| 5 | A | Yes. |
| 6 | Q | I am going to use the term bailiff because |
| 7 | | I understand that to be the same thing; is |
| 8 | | that fair? |
| 9 | A | Yes. |
| 10 | Q | So were you the bailiff in District Court |
| 11 | | or Circuit Court? |
| 12 | A | Mainly District. |
| 13 | Q | Okay. So were there ever times when you |
| 14 | | would be working as a bailiff in District |
| 15 | | Court and also put someone's ankle monitor |
| 16 | | on? |
| 17 | A | No, I had them come after my job. |
| 18 | Q | Okay. What do you mean after your job? |
| 19 | A | After court security. |
| 20 | Q | Like time of day, what time of day would |
| 21 | | that be? |
| 22 | A | I always had them to report at 4:30. |
| 23 | Q | Okay. So you would have them come back at |
| 24 | | 4:30 to get the ankle monitor; is that what |
| 25 | | your testimony is? |

```
1    A        If they was there in court and the judge

2             took them off and they had everything, I

3             would go ahead and take the equipment then.

4    Q        Okay. What about collecting fees?  Would

5             you ever collect fees from folks at the

6             same time as you were working as a bailiff

7             in District Court?
```

[Lines 8–18 redacted]

```
19   A        If they was in court and the judge did an

20            arraignment, and they were on house arrest

21            and the judge said pre-trial in a month and

22            that was a Wednesday, and they said, Mickey

23            I have got the money. I would say hand it

24            here, yeah, and I would go ahead and take

25            it.
```

| | | |
|---|---|---|
| 1 | Q | And give them a receipt, I guess? |
| 2 | A | Yes. All monies that was collected was |
| 3 | | wrote out in a receipt. |
| 4 | Q | Was all monies collected cash? |
| 5 | A | I am just trying to remember if I took a |
| 6 | | check.  I mean I done it a long time.  I am |
| 7 | | not sure if I ever took a check. |
| 8 | Q | Mostly money? |
| 9 | A | Mostly. |
| 10 | Q | Do you know whether there is any sort of |
| 11 | | agreement between EKCS and Sheriff Webb or |
| 12 | | Sheriff Banks related to your work for |
| 13 | | EKCS? |
| 14 | A | No. |
| 15 | Q | Do you recall there being any policies |
| 16 | | about secondary employment for Letcher |
| 17 | | County sheriff's deputies when you were |
| 18 | | working there as deputy? |
| 19 | A | I had to get permission from Sheriff Webb. |
| 20 | Q | Okay. What did that look like getting |
| 21 | | permission? |
| 22 | A | He just give verbal. |
| 23 | Q | Verbal permission? |
| 24 | A | Yes. |

4   Q           ████  Aside from you getting permission

5               from Sheriff Webb, was there any

6               relationship between EKCS and the county or

7               the sheriff's office about deputies

8               performing that work?

9   A           No.

10  Q           So during that time period that you were

11              working for EKCS, what would you do when

12              Ms. Stockham told you that someone on home

13              incarceration was out of range?  Just walk

14              me through an example what that would look

15              like?

16  A           So when she would call me and give me the

17              details out of range what would happened is

18              she would tell me if she called them or

19              not.  I would try to make contact with them

20              or next of kin.

21  Q           Okay. How would you contact them?

22  A           By phone.

23  Q           What would happen next?

24  A           If I made contact with them, I would ask

25              them and see where they was at by phone,

| | | |
|---|---|---|
| 1 | | what was going on some kind of answer why |
| 2 | | they were out of range. |
| 3 | Q | And would be a satisfactory response to |
| 4 | | that question? |
| 5 | A | Someone could tell me hey, I am at the |
| 6 | | doctor's office, and I forgot to tell |
| 7 | | Patty, and I would be like okay, you have |
| 8 | | got to bring in a excuse.  Once you get to |
| 9 | | that office, time in and time out and you |
| 10 | | bring that to me every Thursday. |
| 11 | Q | Okay. What would be an example of a not |
| 12 | | satisfactory response? |
| 13 | A | I am up at Joe's just hanging out having |
| 14 | | coffee. |
| 15 | Q | So what would you do if you got that kind |
| 16 | | of response? |
| 17 | A | I would tell them that they have to go home |
| 18 | | and then, I would contact the courts. |
| 19 | Q | And who would you contact at the courts? |
| 20 | A | The judge. |
| 21 | Q | What would you tell the judge? |
| 22 | A | We have a violation and what the violation |
| 23 | | was. |
| 24 | Q | And then, what would happen next? |
| 25 | A | They would sometimes say get a warrant. |

| 1 | Q | Okay. |
| 2 | A | Sometimes they would say I will issue a |
| 3 | | bench warrant, just give them a break. |
| 4 | Q | That would be the third option to just give |
| 5 | | them a break? |
| 6 | A | Yeah, if they went back home.  If they went |
| 7 | | back home, just give them a break. |
| 8 | Q | Okay. Did you have the description to |
| 9 | | decide when someone should or shouldn't be |
| 10 | | given a break in that scenario? |
| 11 | A | No. |
| 12 | Q | So only the judge can make that decision? |
| 13 | A | Yes. |
| 14 | Q | Was there any documentation of those |
| 15 | | communication and that decision making or |
| 16 | | was that done verbally? |
| 17 | A | Verbally. |
| 21 | Q | Right, yeah. I guess when you were working |
| 22 | | as bailiff, who was the District Court |
| 23 | | Judge before Mullins? |
| 24 | A | Judge Wood. |
| 25 | Q | I think that you referenced earlier that |

| | | |
|---|---|---|
| 1 | | there was a two week training that you got |
| 2 | | as part of that CSO position? |
| 3 | A | No, there is a two week that you get to |
| 4 | | that. I was grandfathered in where that I |
| 5 | | started so many years. When you started |
| 6 | | working as police and CSO, you could get |
| 7 | | grandfathered in if you started years |
| 8 | | before the state required that. |
| 16 | Q | What about Letcher County sheriff's office |
| 17 | | policies, do you recall any training about |
| 18 | | policies specific to Letcher County |
| 19 | | sheriff's department? |
| 23 | Q | I mean once you became sheriff, it was your |
| 24 | | responsibility to enforce those policies? |
| 25 | A | Yes. |

1    Q      I am talking about before, when you were a

2           deputy, do you recall any training about

3           Letcher County sheriff's department

4           policies?

5    A      Yes, we received a policy manual.

6    Q      What would that training consist of?

7    A      I don't know detail by detail, but I

8           generalized myself with the policy book.

9    Q      Okay. So there is a policy book?

10   A      Yes.

██   █      ████████████████████████████████

██          ████████████████████████████████

██   █      █████████████████

14   Q      I have got an Exhibit.  ████████████████

██          ████████████████████████  and it

16          references a 2008 Policy Manual for the

17          Letcher County sheriff's department; do you

18          see that?

19   A      Yes.

20   Q      So I guess back in 2008, was this the first

21          time that Letcher County developed a Policy

22          Manual?

23   A      I don't know.

██   █      █████████████████████████████████████

██          ████████████████████████████████

3    Q        Okay. You testified earlier that you recall

4             receiving a Policy Manual, but do you

5             remember signing anything related to having

6             read or received that Policy Manual?

7    A        I can't remember.

8    Q        Okay. Since you became sheriff, is it your

9             practice to have deputies sign something

10            acknowledging receipt of the policies of

11            the sheriff's department?

12   A        Yes.

13   Q        Are they required to sign that at the time

14            they are hired or when do they sign that?

15   A        Yes.

18   Q        Okay. As part of your work with EKCS, did

19            you actually physically go out to people's

20            homes to get them hooked up on home

21            incarceration?

22   A        No, not to hook them up.

23   Q        Okay. between the time that a person is

24            hooked up and taking off of home

25            incarceration, would you ever be at their

| | | |
|---|---|---|
| 1 | | physical home address? |
| 2 | A | Only if they had a violation and I |
| 3 | | contacted a family member said hey, they |
| 4 | | are gone, they ran off, they cut the ankle |
| 5 | | bank, I might go out sometime and retrieve |
| 6 | | that. Most of the time, I have asked the |
| 7 | | family to come and get it and bring it to |
| 8 | | me. Sorry. |
| 9 | Q | So when you were working as a deputy |
| 10 | | sheriff, did you have a sheriff's |
| 11 | | department vehicle? |
| 12 | A | On and off, sometimes. |
| 13 | Q | Okay. I guess would there ever been an |
| 14 | | instance that you would have driven the |
| 15 | | sheriff's department vehicle out to |
| 16 | | retrieve one of these home incarceration |
| 17 | | devices? |
| 18 | A | Yes. |

2    Q          ▮▮▮  When you were a deputy sheriff, were

3               there any policies on how deputy sheriffs

4               were or were not suppose to use sheriff's

5               department equipment?

6    A          Policy changes all of the time, but at

7               times, yes.

24   Q          The policy regarding sheriff's department

25               equipment and property that you recall,

[redacted]

5    A      Yeah, you can't use department's stuff to

6            do other jobs.

7    Q      Right, and so you talked a little bit about

8            your work with EKCS, you were also security

9            guard at the hospital?

10    A      Yes.

[redacted]

3    Q        █████ We were talking about your work as a

4            security guard at the hospital, and you

5            testified that there was only a verbal

6            approval from Sheriff Webb for you to

7            perform that service?

8    A        Yes.

9    Q        Okay. Did you use any Letcher County

10          sheriff's department equipment or property

11          in performing that job?

12    A        Yes.

13    Q        What did you use?

14    A        Gun, duty belt, and a cruiser at times.

18    Q        And was that a position that you were paid

19          directly by the hospital or did you get

20          paid through the sheriff's department?

21    A        No, the hospital paid us.



3    Q          ▉  What about the security guard at the

4                hospital, what was the time period you were

5                performing that job?

6    A          There was multiple shifts.  It was all – -

7    Q          Years, how many years did you that job?

8    A          I can't remember the years.

9    Q          Okay. More than one year?

10   A          Yes.

11   Q          Why did you decide to run for sheriff?

12   A          It has been my lifelong dream even as a kid

13               to the sheriff.

14   Q          To be a sheriff?

15   A          Yeah. My mamaw and mother told me when I

16               was a kid that I talked about being a

17               sheriff.

18   Q          And think that you testified earlier that

19               you won the election in 2018, and you

20               became a sheriff in 2019; correct?

21   A          Yes.

22   Q          So before you became sheriff,  - - I guess

23               after you won the election and before you

24               became sheriff, did you make a decision to

25               hire Ben Fields?

| | | |
|---|---|---|
| 1 | A | Ben Fields was hired by Sheriff Webb. |
| 2 | Q | Right.  He was hired right as Webb was |
| 3 | | going out and you were coming in. So was it |
| 4 | | Webb's decision to hire or was it your |
| 5 | | decision? |
| 6 | A | I gave a recommendation. |





25   Q      Are you aware of whether there is

1     any kind of agreement between EKCS and the

2     county today related to home incarceration?

3  A  I am not aware.

&#9632;  &#9632;  &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

&#9632;  &#9632;  &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

&#9632;     &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

&#9632;  &#9632;  &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

8  Q  &#9608;&#9608;  Did you receive any training when you

9     got elected as sheriff?

10  A  Yes.

11  Q  Okay. What kind of training did you

12     receive?

13  A  It is the state required training.

14  Q  Okay. Explain to me what that looks like?

15  A  Before I took over, I went, I think, it was

16     December of 2018 to the sheriff's

17     conference.

&#9632;  &#9632;  &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

&#9632;  &#9632;  &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

&#9632;     &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

21  Q  So that is an annual training?

22  A  Yes.

23  Q  Have you attended every year?

24  A  Yes, but one.

25  Q  Okay. What year did you not attend?

| | | |
|---|---|---|
| 1 | A | Covid. |
| 2 | Q | Makes sense.  What kind of training do you |
| 3 | | get at that conference? |
| 4 | A | I mean all different types. |
| 5 | Q | Can you give me some examples? |
| 6 | A | Legal update, they go over PTSD, what signs |
| 7 | | to watch for and stuff like that. |
| 8 | Q | What about supervising employees, and |
| 9 | | training about supervising employees? |
| 10 | A | Yes. |
| 11 | Q | Explain that to me? |
| 12 | A | They just go over and talk about make sure |
| 13 | | that, you know, you recognize your policies |
| 14 | | and stuff like that. |
| 15 | Q | What do you mean by recognize your |
| 16 | | policies? |
| 17 | A | Just make sure they are up to date and |
| 18 | | stuff like that. |
| 19 | Q | Do you believe Letcher County sheriff's |
| 20 | | department's policies to be up to date? |
| 21 | A | To the best of my knowledge. |
| 22 | Q | Aside from attending that training, did you |
| 23 | | anything else ready yourself for the |
| 24 | | sheriff's position as far as training goes? |

```
 9   A      Yeah, I come over and kinda shadowed

10          Sheriff Webb a little bit.

11   Q      Okay.  Anything else?

12   A      Not that I can think of.

18   Q      Did you review or revise any of the Letcher

19          County sheriff's department's policies at

20          the time that you became sheriff?

21   A      Yeah, I familiarized myself with the

22          policies, yes, all of them, and I have

23          through the years.

24   Q      Do you remember revising any of them?
```

5    A    I can't recall.

6    Q    Did you know Ben Fields prior to making

7         that recommendation that he be hired as a

8         sheriff's deputy?

9    A    Work, yeah.

10   Q    What do you mean by work?

11   A    He worked at the jail, and I worked as

12        court bailiff.

16   Q    What did you think of him at that time?

17   A    Nice guy, polite, professional, always at

18        work, just an all around good guy from what

19        I know.

20   Q    Were those the reasons why to hire him for

21        the bailiff position?

22   A    Yeah, he was dependable.

2    Q       All right. Did you know any of Ben's

3            family?

4    A       His dad, Jerry Fields was a long time

5            constable. He was a well respected man in

6            the community and his mother, Nell Fields.

7            As far as anybody else, I didn't really

8            know his family that well.

9    Q       He had a sister Holly that worked at the

10          courthouse, too; correct?

11    A      Not at that time, I don't - - Yeah, she

12          might have worked at the clerk's office.

13    Q      Okay. Prior to recommending him to Sheriff

14          Webb, had Ben Fields ever been to your

15          house before?

16    A      I don't recall.

17    Q      Okay. I understand that you have maybe a

18          weekly poker party?

19    A      I wouldn't refer to it as a poker party.

20    Q      Well what would you refer to it as?

21    A      It is a gathering of friends and

22          individual, you know.  We played Rook

23          there, we played corn hole there, we have

24          had fish fries there that we fed the whole

25          community.  My neighbor's wives have come

1     up and played Rook, and we gather outside

    2     around the fire pit. It is just not poker

    3     all of the time is what I am getting at.

    4  Q                Ben Fields ███████

       █  ████████████████████████████████████

       █  ███████████████████████████████████

       █  ██████

       █  █  ████████████████

       █  █  ██████████ after he became a deputy

   10     sheriff, you did invite him to some of

   11     those parties; correct?

   12  A     Yes.

       █  █  ████████████████████████████

       █  █  ███████████████████████████

       █  █  █████████████████████████

       █  █  ████████████

       █  █  ████████████████████████████

       █     ████████████████████

       █  █  ██████████████████████

       █     █████████████████████████████

       █     █████████████████

       █  █  ██████████████████████

       █     ███████████████████████

       █     ████████████████████████████

       █     ████████████████████████



3    Q          Do you remember whether you

4    ever reviewed his pre-POPS report?

5    A          Yeah, I am sure that I have looked at it.



5   A       That examination, that report that they

6           send in, they recommend suitable.

7   Q       Who is they?

8   A       It is DOCJT, I believe.

18  A       They send a report saying that they are

19          suitable for the job. I have got reports

20          that says is not suitable for the job, so I

21          took that as the state recommendation that

22          he passed their exam.



6    Q        What is this?

7    A        It looks like he received the office

8             policy.

9    Q        ▮▮▮    I was going send you that earlier

10            form that we looked it required someone to

11            verify that they both received and read the

12            policy manual, but this only requires only

13            that they verify that they received a copy.

14            Do you know when or why that changed?

16   Q        Okay. And this looks like it was signed by

17            Ben Fields on April 13th of 2020; correct?

18   A        That is what it looks like.

19   Q        But that was some 15 months after he had

20            already started working for the Letcher

21            County Sheriff's Department; correct?

22   A        Yes.



6    A       I don't know if Sheriff Webb gave him one

7            or not.  He should have.

6    Q    [REDACTED] I know that you said more things

7         happen than just playing poker.  You

8         invited male deputy sheriffs to some of

9         those parties at your house where you

10        played cards; correct?

11   A    Yes.

12   Q    Okay. And that included Jason Eckels, and

13        Ben Fields; correct?

14   A    Yes.

15   Q    Any other deputy sheriffs that you invited

16        to those gatherings?

17   A    Mike Enfusse.

18   Q    Okay. Was he a deputy sheriff?

19   A    Court security officer. You keep calling

20        them deputies, but court security officers.

21   Q    And I guess impression was were there

22        Letcher County sheriff deputies who has a

23        specific role as a CSO; is that correct to

24        think of it that way?

25   A    That is a true statement, yeah.

1   Q     Anyone else aside from Deputy Enfusse?

2   A     Charles Fernandez.



16  Q     When you are working as a home

17        incarceration officer for EKCS, did you

18        ever invite any women who were on home

19        incarceration to your house during one of

20        those poker games?

21  A     Absolutely not.



4    Q    Okay. So are CSOs paid by the hour?

5    A    Yes.

6    Q    And Ben Fields was a full time employee?

7    A    Yes.

Q    let's be

23   specific to Ben Fields?

24   A    Okay.

25   Q    Did he have a time of day that he was

1    suppose to report to work and a hour that

2    he got off work every day?  How did his

3    schedule work?

4  A  8:00 to 4:30.

5  Q  Okay. So those were the hours that he was

6    working for the sheriff's department?

7  A  Yes.



15    Q         ▮▮▮     Who is Lashauna?

16    A         She is the bookkeeper and office manager at

17              the office.

18    Q         For the sheriff's department?

19    A         Yes.

24    Q         I want to talk about our involvement in

25              getting Ben Fields the position with East

```
1                    Kentucky Correctional Solutions?

2       A            Yes.
```

███████████████████████

███████

██

████████████████████████

██████████████

███████████████

████████

████████████████████████

█████████████████████████

███████████████████████

█████████████████████

████████████████████████

███████████████████

```
16      Q            So you decided to recommend Ben Fields for

17                   that job.  What do you recall about your

18                   decisions with Patty?

19      A            After that I won the election, she was

20                   disappointed and she was like I don't know

21                   what I am going to do. I need somebody.

22                   Can you find somebody? And I told her that

23                   I would look around.

24      Q            Okay. What did you do next?

25      A            I found somebody that I thought would be
```

| | | |
|---|---|---|
| 1 | | good for the job. I called her and said, |
| 2 | | hey, he is a great guy all around good guy. |
| 3 | | He has worked at the jail, and you know, I |
| 4 | | told her that I had checked with the |
| 5 | | previous jailer and nothing, no - - |
| 6 | Q | I guess did she know that he was planning |
| 7 | | to become a deputy sheriff by that point? |
| 8 | A | Yes. |
| 9 | Q | And so I guess she agreed to hire him as |
| 10 | | far as you know? |
| 11 | A | As far as I know. |
| 12 | Q | And you actually trained Ben Fields for the |
| 13 | | EKCS position; correct? |
| 14 | A | I let him shadow me. |
| 15 | Q | Okay. What do you recall of that? |
| 16 | A | Basically, when I do my house arrest on |
| 17 | | Wednesday at 4:30, have everybody report, I |
| 18 | | would show him the paperwork, the forms. |
| 19 | | See, everything is different now, you know, |
| 20 | | they do GPS now. I don't believe that I was |
| 21 | | ever part of GPS. My old first house arrest |
| 22 | | box was almost as big as that TV.  I mean |
| 23 | | no joke, it was a white box this big.  You |
| 24 | | had to have a manual key to turn it on and |
| 25 | | you had to have a phone landline.  They |

1  wasn't none of this tracking people. It

2  would only let them get 100 feet outside

3  their residence and it would tell you if

4  they had a violation, cut the strap,

5  unplugged the box stuff like that. So I

6  went over all of that paperwork with him,

7  and all of that stuff.

█  █  █

█  █  ███

█  ███

█  ███

█  ███

█  ███

█  ██

15  Q  ██  Were you aware of Ben Fields

16  receiving any other training aside from the

17  training that he got from you?

18  A  I am aware.

19  Q  Okay. Were there any EKCS policies or

20  procedures that you reviewed with Mr.

21  Fields?

22  A  No, I didn't.

23  Q  Aside from that initial conversation with

24  Patty Stockham that you already described,

25  were there any other discussion that you

1           had with her about hiring Ben Fields?

2    A      Not that I recall.

18    Q      Prior to February of 2022 when you

19           terminated Fields, were you aware that

20           there were times when he was performing

21           services for EKCS while also in the

22           courtroom and working as a bailiff; were

23           you aware of that?

24    A      I don't recall.



Q                   Were you aware that
Fields, Ben Fields, was performing services
for EKCS while he was wearing a Letcher
County Sheriff's Deputy uniform?

A      No, I don't recall.

10   A     Is at 4:30 when I got off at sheriff's

11         office, my sheriff didn't require me to go

12         all of the way home and come back with e a

13         personal truck and personal clothing, but

14         now if I was out after hours, I was in

15         personal clothing,

   Q     So you are the sheriff?

22   A     Yes.

23   Q     And Ben Fields is the EKCS home

24         incarceration officer?

25   A     Uh-huh.

1  Q     Is he allowed to perform services for EKCS

2        while wearing a Letcher County Sheriff's

3        Deputy uniform?

███ █████████ █████████████████████████████████

███ █████████████████████████████████████████████

6  A     If somebody is in court, and they say hey.

7  Q     So does it matter, in different situations

8        is it okay, and other situations it is not

9        okay; is that what you are saying?

███ █████████ ██████████████████████████████████

███ ████████████████████████████████████████████

███ █████████████

13  A     Yes.

███ █████████ ████████████████████████

███ ███████████████████████

███ █  ██████████

17  Q     So you are saying that if Ben Fields were

18        to be wearing his deputy sheriff's uniform

19        while performing services for EKCS, he did

20        it with your permission?

███ █████████ █████████████████████████████████

███ ███████

23  A     I don't recall.

███ █  █████████████████████████████████

███ ██████████████████████████████



Q

So was Ben Fields
allowed to wear his deputy sheriff's
uniform while performing services for EKCS
at any place or at any circumstance?

A     Yes.

A     If he was at the courthouse.





13    A        I can't allow him to wear the uniform when

14             he is out working for house arrest at any

15             time, just going around and stuff. I don't

16             know what you are asking.

17    Q        Okay. So that was not allowed. I think I

18             heard you say earlier that there were some

19             circumstances where it was allowed. What

20             would be the circumstances where it was

21             allowed?  I think I heard you say if he is

22             at the courthouse and it is right after

23             work hours; is that accurate?

24    A        Yeah.

Q     ████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████ if it is during

his deputy sheriff work hours or if it

immediately thereafter and he is still at

the courthouse, it is okay for him to wear

that deputy sheriff uniform; correct?  Does

that mean at all other times it was not

allowed - - he was not allowed to wear his

deputy sheriff uniform and perform services

pre-EKCS like hooking someone up and so

forth?

A     Yes.

Q     ███████ What about his Letcher County

Sheriff Department vehicle, did Ben Fields

have a vehicle from the sheriff's

department?

A     Yes.

11    Q    Were there any rules about what they were

12         or were not allowed to do with their

13         sheriff's department vehicles?

14    A    Yeah, coming back and forth to work, they

15         would do transports for me, they would

16         serve papers, you know, if they were on

17         their way home and needed to stop at the

18         grocery store or something like that.

9   Q   Were any rules or policies about when Ben

10      Fields was or was not allowed to use his

11      deputy sheriff vehicle to perform services

12      for EKCS?

13  A   He should be using it unless that he had

14      approval from me.

15  Q   Okay. Do you recall him reaching out to you

16      to get approval to do something for EKCS

17      with his sheriff department vehicle?

18  A   Maybe on the way home to stop and get ankle

19      out of the creek.

20  Q   Where was that?

21  A   Out of like the creek. The GPS, they know

22      where the ankle band is at, you know, the

23      creek.

24  Q   Did you say out of the creek?

25  A   Yeah, like somebody cuts it off and throws

1        it over the hill or something.



17   Q        Was there ever a time when you told Ben

18            Fields that he wasn't allowed to use

19            sheriff's department equipment or vehicle?

20   A        I don't recall.

| | | |
|---|---|---|
| 1 | Q | I want to go through some policies with you |
| 2 | | that you produced in Discovery. Do you |
| 3 | | recognize this policy? |
| 4 | A | Yes, ma'am. |
| 5 | Q | Was this policy in affect between 2019 and |
| 6 | | 2022? |
| 7 | A | Yes. |
| 8 | Q | I guess what did you do to train deputies |
| 9 | | sheriffs on this policy? |
| 10 | A | I gave them a copy of the policy and told |
| 11 | | them to read it and be familiar with it. |
| 12 | Q | Anything aside from that? |
| 13 | A | Not that I recall. |
| 14 | Q | There is some reference in her to an oath |
| 15 | | of office. Do all deputy sheriffs take an |
| 16 | | oath of office or do only some, and I am |
| 17 | | looking at the first page under personal |
| 18 | | conduct (A) Oath of office. Do you see |
| 19 | | that? |
| 20 | A | Yes. |
| 21 | Q | Do all deputy sheriffs take an oath of |
| 22 | | office? |
| 23 | A | Yes. |
| 24 | Q | I want you to look at the second page under |
| 25 | | (D) Abuse of position? |



8    Q    Do you think that Ben Fields violated this

9         provision of the policy when he was a

10        deputy sheriff as we sit here today is that

11        your opinion?

12   A    Yes.

Q ████████████████████████████████

On the second page also under Section 7-

Violations of Ethical Standards. There is

some reference to investigating ethical

conduct violations. ████████████

████████████████████████████████

████████████

█ ██████████████████████

Q Have you ever conducted an investigation of

a violation of ethical standards since you

have been sheriff?

█ ████████████████████████████████

█ ████████████████████████████████

████████████████████████████████

████████████████

A I don't recall.

█ ████████████████████████████

████████████████████████████

████████████

██████████ ████████████

██████████ ████████████████████

████████████████████████████

██████████ ████████████

██████████ ██████████

█ ████████████████████

Q So the second sentence says the department

shall conduct annual in-service training on

ethics. Do you see that?

A Yes.

Q Does the Letcher County Sheriff Department

conduct annual in-service training on

ethics?

A No. I give them the policy and tell them to

1        familiarize their self with the policy.

15   Q    What is CALEA, if you know?

16   A    I don't recall.

17   Q    Is the Letcher County Sheriff's Department

18        do you have any kind of accreditation?

19   A    I don't recall.

20   Q    Okay. I guess not to your knowledge?

21   A    Yeah, not to my knowledge.

22   Q    At any time since you have been sheriff,

23        have you made any revisions or changes to

24        this policy?

25   A    I don't recall.

11 Q [REDACTED] Is there any Letcher County

12 specific Letcher County Sheriff's

13 Department annual training?

14 A The range training qualification, you know,

15 qualification with fire arms.  We have all

16 kinds of training for different computer

17 systems.  You know, NARCAN, I don't know if

18 that is every year. You know, they have

19 changed that so much you got to do that.

20 There is stuff with the DOCJT that the

21 deputies can be a part of that reviews it

22 every week I think that counts as training.

23 I mean we have all kinds of training.

1 ██████████████████████████████████████

2 A    The state does most of the training

3      material.

4 Q    But I wouldn't think that the state would

5      train deputies on the Letcher County

6      Sheriff's Department policies; correct? I

7      am asking about annual training from the

8      Letcher County Sheriff's Department on the

9      Letcher County Sheriff's Department

10     policies, is there any such annual

11     training?

██ ██████████ ████████████████████████████

██ ████████████████████████████████████

██ █████████████████████

██ █ ████████████████████████████

██ ███████████████████████████

17 A    I don't recall.

██ █ ████████████████████

██ ██████████████████████████

20 Q    Let's look at this policy. ███████████████

██        █████████████████     This one was attached to

22     Fields' deposition also.  Do you recognize

23     this policy?

24 A    Yes, ma'am.

25 Q    Okay. Was this policy in affect from 2019

```
1              thru 2022?

2    A         Yes.

3    Q         So this is a policy that governs secondary

4              employment; correct?

5    A         Yes.
```

███████████████████████████████
███████████████████████████████████
███████████████████████████████
████
██████
███████████████████████
████████████████████
██████
████████████████████████████
████████████████████████████
████████████████████████████
██████████████████████████████
████████████████████████████
███████████████████
███████████████

```
21   Q         Okay. What about outside employment? Have

22             any Letcher County Sheriff's Department

23             employees sought approval for outside

24             employment?

25   A         Not that I recall.
```

```
 1    Q         Okay. It looks like this policy requires

 2              for extra duty detail that the employer,

 3              the secondary employer themselves have to

 4              submit a permit application for approval

 5              through the sheriff's department. Would you

 6              agree with that?

███    ███      ██████████████████████████

███    ███      ████████████████████████████████████

███            █████████████████████████████████████████

███            ███████████████████████████

11    A         Yes, right there.

12    Q         Extra duty detail as I read this definition

13              it states performance of law enforcement

14              duties not within regularly scheduled hours

15              provided to any business person or

16              enterprise.  The services that East

17              Kentucky Correctional Solutions provided

18              included law enforcement duties; do they

19              not?

20    A         No, they did not.

21    Q         What kind of duties did they perform then?

22    A         They are just monitoring the people on

23              house arrest and reporting back to the

24              court.

25    Q         So would you consider that to be police or
```

| | | |
|---|---|---|
| 1 | | non police nature? |
| 2 | A | That would be non police. You don't have |
| 3 | | to be a police officer to do that job, |
| 4 | | because they was a lady before me that |
| 5 | | wasn't a police officer that done it. |
| 6 | Q | Who was that lady? |
| 7 | A | I think her name was Dottie. I remember |
| 8 | | her first name Dottie. |
| 9 | Q | She was somebody in Letcher County? |
| 10 | A | Yes, I think so. |
| 11 | Q | So can you give me some examples of what |
| 12 | | the Letcher County Sheriffs Department what |
| 13 | | kind of performance of duties would qualify |
| 14 | | by its extra duties details? |
| 15 | A | It would be like security at the school |
| 16 | | ball games. |
| 17 | Q | Okay. So is that the SRO position what you |
| 18 | | described previously or is that different? |
| 19 | A | It could qualify as that. |
| 20 | Q | Okay. Did the folks that wanted to hire |
| 21 | | Letcher County Sheriff's Department |
| 22 | | personnel for security at the ball games, |
| 23 | | did they submit an application for approval |
| 24 | | of a permit? |
| 25 | A | No, no, uh-uh. |

```
1   Q     But under this policy they were suppose to;

2         correct?

3   A     I have verbal.

4   Q     So you gave verbal permission to who?

5   A     It don't happen often. One of the road

6         deputies might help with the ball game and

7         they will pay.

8   Q     Who do they pay?

9   A     They pay the road deputy.
```

11    Q        What about employment that is of a non

12             police nature.  Can you give me an example

13             of what that could be?

14    A        Wal-Mart, retail, gas station.

15    Q        Okay. Where in your opinion does EKCS fit

16             between these different definitions for

17             secondary employment?

18    A        The later, the second one.

19    Q        Okay. So is it your testimony that working

20             as a home incarceration officer with EKCS

21             is work that provides no real or implied

22             law enforcement services to the employer

23             and is not performed during assigned hours

24             of duty?

25    A        Yes.

1    Q    So in a situation where someone has got

2           outside employment, this policy requires

3           that they submit - - they have some kind of

4           permission form. Do you see that on the

5           last page?

6    A    Yes.

7    Q    Says the department will develop an outside

8           employment request form?

9    A    Yes.

10   Q    Has the Letcher County Sheriff Department

11         got an outside employment request form?

12   A    We don't.  Sheriff Webb didn't have one. He

13         would do a verbal with me.

14   Q    But you were the sheriff between 2019 and

15         2021; correct?

16   A    Yes.

17   Q    And this policy was in affect from 2019 to

18         2021; correct?

19   A    Yes.

     Q    ██████████████████████████████████████

           ███████████████████████████████████████

           ███████████████████████████████████████

           ███████████████████ So you never developed

24         an outside employment request form;

25         correct?

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | This policy requires deputy sheriffs who |
| 3 | | have outside employment to submit a |
| 4 | | statement indicating that no aspect of the |
| 5 | | employment could be considered questionable |
| 6 | | in nature such as placement in compromising |
| 7 | | situation, use of police powers or have the |
| 8 | | potential to bring discredit to the |
| 9 | | department. Do you see that under sub |
| 10 | | section D. |
| 11 | A | You said D, right here. |
| 12 | Q | Do you see that? |
| 13 | A | Yes. |
| 14 | Q | Okay. Did you ever require Ben Fields to |
| 15 | | provide you with any such statement as |
| 16 | | provided for on that - - |
| 17 | A | Not that I recall. |
| 18 | Q | Sub section B, D. Okay. And then, I am |
| 19 | | looking at the next section here that talks |
| 20 | | about requiring that someone who works for |
| 21 | | the Letcher County Sheriff's Department who |
| 22 | | gets outside employment, they are suppose |
| 23 | | to provide a statement indicating the |
| 24 | | services rendered will not be connected |
| 25 | | with security work, investigations, or |

| | | |
|---|---|---|
| 1 | | collection or repossession of property and |
| 2 | | will not involve any law enforcement |
| 3 | | duties. Do you see that? |
| 4 | A | Yes. |
| 5 | Q | Did ou ever receive such a statement from |
| 6 | | Ben Fields related to his work with EKCS? |
| 7 | A | Not that I recall. |

| 14 | Q | And it looks like there is also a |
|---|---|---|
| 15 | | requirement for officers who obtained |
| 16 | | written approval that they then resubmit |
| 17 | | their applications for reapproval on an |
| 18 | | annual basis.  Did that happen consistent |
| 19 | | with this policy as to Ben Fields work with |
| 20 | | EKCS? |
| 21 | A | Not that I recall. |
| 22 | Q | Have you ever had anybody submit any kind |
| 23 | | written form for approval of outside |
| 24 | | employment? |
| 25 | A | Not that I recall. |

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

█████████████████

█████████████████████████████████████

7    Q        So do you recognize this policy?

8    A        Yes.

9    Q        Okay. And was this policy in effect between

10            2019 and 2022?

11   A        Yes.

12   Q        This looks to be a sexual misconduct policy

13            and I am looking down under definitions of

14            sexual misconduct.  This includes sexual

15            activity while on duty or stemming from

16            official duty. Do you see that?

17   A        Yes.

18   Q        And it also includes use of official

19            position and official resources to obtain

20            information for purposes of pursuing sexual

21            conduct. Do you see that?

22   A        Yes.

23   Q        I am looking at the second page now. A

24            police officer/sheriff's deputy shall not

25            I am reading from D.

| | | |
|---|---|---|
| 1 | A | Okay. |
| 2 | Q | Shall not engage in sexual conduct with |
| 3 | | another person who is in the custody of law |
| 4 | | as such officer has supervisory or |
| 5 | | disciplinary authority over such other |
| 6 | | person.  Do you see that? |
| 7 | A | Yes. |
| 8 | Q | Do you agree with me that Sabrina Adkins |
| 9 | | and Jennifer Hill, while they were on home |
| 10 | | incarceration, were they in the custody of |
| 11 | | law according to this policy? |
| 12 | A | Yes. |
| 13 | Q | And did Ben Fields have supervisory or |
| 14 | | disciplinary authority over Sabrina Adkins |
| 15 | | and Jennifer Hill while they were on home |
| 16 | | incarceration? |
| 17 | A | Yes. |
| 18 | Q | So on sub section E right below the one |
| 19 | | that I was just reading. It talks about |
| 20 | | sworn officers receiving specific training |
| 21 | | about sexual misconduct. Do you see that? |
| 22 | A | Yes. |
| 23 | Q | So what kind of specific training did the |
| 24 | | Letcher County Sheriff's Department provide |
| 25 | | in the time that you been sheriff regarding |

1    this policy?

2  A    None that I recall.

3  Q    Do you believe that Ben Fields violated

4       this policy based on his actions that are

5       subject in this litigation?

6  A    Yes, absolutely.

[REDACTED]

11 Q    [REDACTED] I am

12      reading from the third line, immediately

13      contacting the internal affairs section.  I

14      am just wondering what is the internal

15      affairs section for the Letcher County

16      Sheriff's Department?

17 A    We don't have one.

   Q    [REDACTED]

                [REDACTED] Is there anybody else with

22      internal affairs responsibility within the

23      Letcher County Sheriff's Department?

24 A    Not that I recall.

   [REDACTED]



11    Q    So this looks to be a letter dated February

12         2. I think this is the most detailed of any

13         of the documents signed by you related to

14         Ben Fields' termination; is that correct?

15    A    Yes.

16    Q    And I guess this does specify that you

17         violated - - or that you terminated Ben

18         Fields due to his violation of certain

19         policies. Was it just the ethic policy that

20         is referenced?

21    A    Yes.

22    Q    Conduct unbecoming?

23    A    Yes.

24    Q    Do you believe that Ben Fields also

25         violated this sexual misconduct policy?

1    A        Absolutely.

18   Q        So that section is the basis that you sited

19            for terminating Ben Fields; is that

20            correct?

21   A        Which one?

22   Q        Sub Section 10 conduct of unbecoming. I just

23            want to clarify that I am looking at the

24            right thing. On the second page of that

25            policy under X conduct unbecoming that is

```
 1           the provision that you terminated Ben

 2           Fields pursuant to; is that correct?

 3    A      That is the one that the county attorney

 4           recommended, yes.

 5    Q      Well, did you agree with the county

 6           attorney's recommendation?

 7    A      That is the one that the county attorney

 8           recommended.

 9    Q      Okay. Do you always consult the county

10           attorney in employee terminations or

11           disciplinary matters?

12    A      Yes.

13    Q      Why?

14    A      They are the county attorney.  They give

15           legal guidance.  I am not an attorney.

24    Q      So in a normal situation, I don't know what

25           normal is, I guess, but in a situation that
```

| | | |
|---|---|---|
| 1 | | does not involve criminal activity, would |
| 2 | | you still consult the county attorney? |
| 3 | A | Not always. |
| 4 | Q | But sometimes? |
| 5 | A | Sometimes, yes. |
| 6 | Q | Okay. |

When did you first become aware of the
fact that Ben Fields had engaged in some
sort of sexual misconduct?

| | | |
|---|---|---|
| 16 | A | I don't remember the exact date. |
| 17 | Q | Well, how do you recall becoming aware of |
| 18 | | it? |
| 19 | A | A reporter called the office and I talked |
| 20 | | to them on the phone. |

| | | |
|---|---|---|
| 25 | A | I had not received the civil case. That was |

| | | |
|---|---|---|
| 1 | | the first time I heared of it was the |
| 2 | | reporter. |
| 3 | Q | Do you know who Chris Triplett is? |
| 4 | A | Yes, I know Chris. |
| 5 | Q | Okay. Were you aware that he had reported |
| 6 | | sexual misconduct by Ben Fields to the |
| 7 | | Letcher County Sheriff's Department |
| 8 | | sometime in mid December? |
| 9 | A | No, I was not aware of that. |
| 10 | Q | Did you become aware of that at some point |
| 11 | | in this litigation? |
| 12 | A | I have seen it on the reports. |
| 13 | Q | Have you ever asked your staff or talked to |
| 14 | | other deputy sheriffs to inquire whether |
| 15 | | that complaint had been made? |
| 16 | A | Yes. |
| 17 | Q | Okay. And what was the response that you |
| 18 | | got? |
| 19 | A | They said that he did not come in and file |
| 20 | | that complaint. |

| | | |
|---|---|---|
| 1 | Q | Okay. Does you office have any kind of |
| 2 | | procedure for documenting complaints if |
| 3 | | someone was to come in or call the office |
| 4 | | and make a complaint about sexual |
| 5 | | misconduct against a sheriff's deputy? Is |
| 6 | | there some sort of process for how that |
| 7 | | gets documented and investigated? |
| 8 | A | Anyone that comes in to file a complaint, |
| 9 | | they are going to ask them to sit and wait |
| 10 | | on me and talk to me. |
| 11 | Q | Is that written in the policy somewhere? |
| 12 | A | Not that I recall. |
| 13 | Q | Okay. How did you advise your deputy |
| 14 | | sheriffs and staff that is what they needed |
| 15 | | to do? |
| 16 | A | I would tell them. I am the boss. If |
| 17 | | anybody comes in to complain, I want to |
| 18 | | talk to them. |



25      Q       Do you recognize this policy?

```
1    A        Yes.

2    Q        Okay. Was this policy in affect between

3             2019 and 2022?

4    A        Yes.

5    Q        And so this looks to be a policy about how

6             you address citizen complaints. My first

7             question is have you ever employed this

8             policy to investigate any kind of citizen

9             complaint to your recollection?

10   A        Not that I recall.
```



| | | |
|---|---|---|
| Q | ████████████████████████ | It |

talks about an informational public

brochure.  Do you see that?

A     Yes.

Q     Okay. Does Letcher County have any kind of

informational public brochure to notify the

community of how to provide the sheriff's

department with a complaint alleging

employee misconduct?

A     Not that I recall.

Q     Says that these brochures will be

maintained in all police, sheriff facility

lobbies, sheriff's informational desks,

ect. Does that refresh your recollection.

Is there any such brochure?

A     Not that I recall.





11    Q    You have got a number of deputies?

12    A    Yes.

13    Q    Is there any sort of supervisor deputy or

14         are they on the same level so to speak?

15    A    On the same level.

16    Q    So if there is any reference in this policy

17         to like a supervisor - -

18    A    That is me.

19    Q        Was there any kind of investigation

20             conducted by your office related to the

21             allegations against him from late January

22             early February of 2022?

23    A        No, I just took the initial information.

24    Q        There was no administrative investigation?

25    A        Just what information that I got I reviewed

| | | |
|---|---|---|
| 1 | | everything with the county attorney and he |
| 2 | | give me advice on what that I needed to do. |
| 3 | | The documentation of it is just this. |
| 4 | Q | And what information did you have aside |
| 5 | | from I guess a phone call from a reporter? |
| 6 | A | I got a phone call from a reporter. You |
| 7 | | have got me bouncing back and forth. I am |
| 8 | | trying to remember. I got a phone call from |
| 9 | | a reporter was the first thing. I believe |
| 10 | | that I called Mr. Fields and told him what |
| 11 | | was alleged, and then, after that happened, |
| 12 | | Judge Craft and Robbie Kinzer come to my |
| 13 | | office and gave some information. ███████ |
| 14 | | ████████████████████████████████ I |
| 15 | | consulted with the county attorney. I |
| 16 | | believe that he actually came over to the |
| 17 | | office and Lashauna Frazier was with me, |
| 18 | | the office manager. |
| 19 | Q | Okay. Was this all on the same day? |
| 20 | A | Yes, the evening. That is when that was |
| 21 | | produced. |
| 22 | Q | So that was the day that all of the |
| 23 | | occurred that would have been January 31, |
| 24 | | 2022; is that correct? |
| 25 | A | Yes. |

6   A       I also talked to the Commonwealth Attorney

7           at the time.

8   Q       Is that Edison Banks?

9   A       At the time, yes.

19  Q       My question is anything that you did that

20          day?

21  A       Once that I talked to Mr. Hatton, we done

22          this, Brianna Cornett came in.

23  Q       So Brianna Cornett actually came to your

24          office?

25  A       Yes.

KSP said no we are not
going to investigate it. We work too close
with you. I don't want an investigation of
this magnitude done internally.  So Mr.
Banks said that I am going to get ahold of
the AG's office.  Mr. Banks told me the
AG's office would take the investigation.



20    Q        Do you recognize this policy?

21    A        Yes.

22    Q        This policy is called Training Directive.

23             Was it in effect between 2019 and 2022?

24    A        Yes.

25    Q        Okay. And this policy identifies and number

|   |   |   |
|---|---|---|
| 1 |   | of high risks critical tasks. Do you see |
| 2 |   | that? |
| 3 | A | Yes. |
| 4 | Q | And it provides that each member of an |
| 5 |   | agency will receive an annual block of |
| 6 |   | training on each of the high risk critical |
| 7 |   | tasks identified. Do you see that? |
| 8 | A | Yes. |
| 9 | Q | So did the Letcher County Sheriff's |
| 10 |   | Department itself provide any block of |
| 11 |   | training on these high risk critical tasks? |
| 12 | A | Not that I recall. |
| 13 | Q | Who would have provided annual training on |
| 14 |   | these high risks critical tasks? |
| 15 | A | They all received the training by the |
| 16 |   | state. |
| 17 | Q | And that is on an annual basis? |
| 18 | A | Some is on an annual, and some on ever two |
| 19 |   | years, that is the minimum of the state. |
| 20 | Q | Do you see on the second page under H, |
| 21 |   | sexual harassment/external sexual |
| 22 |   | misconduct by officers is identified there |
| 23 |   | as one of the high risk critical tasks? |
| 24 | A | Yes, I see that. |
| 25 | Q | So did the Letcher County Sheriff's |

```
1              Department provide annual block training on

2              sexual harassment and external sexual

3              misconduct by officers?

4    A         Not that I recall.
```

9    Q          [redacted] I am looking at Sub Section B

10             of documentation here.  It talks about

11             agency files will contain a lesson plan, an

12             outline of each in-house training session.

13             Do you see that?

14   A         Yes.

15   Q         Do you have any lesson plans or outlines

16             for in-house training sessions?

17   A         Not that I recall.

18   Q         Is that because there have not been any in-

19             house training sessions on sexual

20             misconduct since you have been sheriff?

21        **MR. SHAW:** Object to form.

22   A         Not that I recall.



18    Q       Do you recognize this communication chain?

19    A       Yes.

20    Q       And is this a facebook communication chain

21            between yourself, Ben Fields, and Jason

22            Eckels?

23    A       Yes.

24    Q       Is this a facebook communication chain from

25            June 14, 2021 thru June 15, 2021?



10    Q          Did you use facebook messenger to

11    communicate with deputy sheriffs about work

12    related matters?

13    A          Some, yes.

3    Q         ████████████ you entitled this group fat

4              boys. Do you see that at the top?

5    A         Yes, ma'am.

6    Q         Okay. Why did you call it that?

7    A         Look at me.

22   Q         Great. Did you consider Eckels and Fields

23             your boys or Mickey's boys?

24   A         No, they are my employees.

██████████████████████████████████

██████████████████████

3    A        ██    they are all my friends.  They are all

4             my work family, you know.  We have cookouts

5             together as an office.  We try - - This is

6             very childish, but it is a way for us to

7             make fun of each other and just release

8             some stress.  You know, when I consulted

9             with my attorney after I seen the exhibits

10            in Mr. Fields' case. And I have eliminated

11            all of that, and I have talked to everybody

12            verbally and did a verbal reprimand, and it

13            will never happen again.

14   Q        So you have done that since this past

15            weekend when we took Mr. Field's

16            deposition?

17   A        Yes.

██    ██    ████████████████████████████████

██    ██    ████████████████████████████████████

██    ██    ████

██    ██    ████████████████████████████████████

██    ██    ██████████████████████████████

██    ██    ██████████████████

██    ██    ████████████████████

██    ██    ████████████████████



6   Q        Do you dispute that these

7            were conversations that you had with Jason

8            Eckels and Ben Fields back in June of 2021?

9   A        No, I don't dispute it.

24  Q        Jason Eckels says on this page I busted the

25           window out and left a note that said " Mr.

| | | |
|---|---|---|
| 1 | | Stines appreciates your business," and |
| 2 | | left. Do you see that? |
| 3 | A | Yes. |
| 4 | Q | Was that a joke or do you think that he |
| 5 | | actually did that? |
| 6 | A | No, that was joke. |
| 7 | Q | Do you think that was funny? |
| 8 | A | If he had really done that, no. Knowing Mr. |
| 9 | | Eckels, it was a joke. He is childish. |
| 10 | Q | Did you ever discipline him or reprimand |
| 11 | | him for being childish in any of the |
| 12 | | communications that are in these messages? |
| 13 | A | I have talked to him, yes. |
| 14 | Q | When did you talk to him? |
| 15 | A | I have talked to him during this, too, when |
| 16 | | he makes crazy memes and stuff. You know, |
| 17 | | we go overboard and I tell them that they |
| 18 | | have got to relax. Quit being childish |
| 19 | | let's be more professional. |
| 20 | Q | Is there any sort of documentation of you |
| 21 | | telling them that? |
| 22 | A | No, it is verbal. |
| 23 | Q | Did they stop after you told them that they |
| 24 | | were being childish and they had gone too |
| 25 | | far? Did you answer that question? |

```
 1    A      They have stopped now.

 2    Q      Okay. When is now?

 3    A      Right now.

 4    Q      As in since last week?

 5    A      Yeah.

 █    █      ████████████████████████████████████

 █           ██████

 █    █      █████

 9    Q      █████ I guess Jason Eckels still works there?

10    A      Yes.

11    Q      Has he continued with this kind of joking

12           childish behavior up through last week when

13           you told him it was time to stop?

14    A      Yes.

 █    █      ████████████████████████████████████

 █           ██████████████████████

 █    █      ████████████████

18    Q      I am looking at page marked 1191 it looks

19           like a naked policeman. It looks to be an

20           image that Jason Eckels sent to you and Ben

21           Fields on June 14$^{th}$; is that correct?

22    A      Yes.

23    Q      Okay. And was your response to him sending

24           that image good morning boys LOL?

25    A      Yes.
```

1  Q      So you thought it was funny?

2  A      Yes.

3



```
16    Q         So does this also to be some messages

17              between yourself and Fields and Jason

18              Eckels dated, I guess, June 18$^{th}$ of 2021?

19    A         Yes.

20    Q         Okay. And it looks likes, by my read,

21              Deputy Eckels and Deputy Fields are

22              discussing some transports to Hazard?

23    A         Yes.

24    Q         Okay. And Ben Fields writes, I think they

25              both like the same sex, though.  Jason
```

| | | |
|---|---|---|
| 1 | | Eckels writes, you mean like freaky sex, |
| 2 | | and Jason Eckels responds, hardcore? Were |
| 3 | | they discussing the sexual orientation or |
| 4 | | sexual proclivities of these persons who |
| 5 | | they are about to transport? |
| 6 | A | I can't answer that. I don't know. |
| 7 | Q | Well, you received the messages back in |
| 8 | | June of 2021. I don't know who they would |
| 9 | | be talking about, if not, the persons who |
| 10 | | they are about to transport, but I am |
| 11 | | wondering what your interpretation is - - |
| 12 | | was when you read it? |
| 13 | A | To be honest with you, I don't read a lot |
| 14 | | of these, because they are so childish. If |
| 15 | | you will look mine - - I don't read a lot |
| 16 | | of them. I get a lot of messages that I |
| 17 | | don't even pay attention to. |

3    Q       Is it a appropriate for a deputy sheriff to

4           discuss the sexual orientation or sexual

5           proclivities of persons who they are

6           transporting?

7    A       Absolutely not.

8    Q       Did Ben Fields or Jason Eckels ever get

9           disciplined or reprimanded for having this

10         conversation?

11    A      This certain one, I can't recall.

12    Q          ████ All of those folks who are a party to

13               this communication are also working under

14               your supervision as the Letcher County

15               sheriff's department; correct?

16    A          Yes.

17    Q          Okay. This was June 23rd thru June 25th of

18               2021; correct?

19    A          Yes.

20    Q          Okay. So it looks like Deputy Norris shares

21               a screen shot that sort of by my read

22               making a joke about sexual arousal and

23               Crown Victoria vehicles; is that fair?

24    A          That he had sent to his wife, yes.

25    Q          And then, he shared it with you and his co-

1    workers; right?

2  A    Yes.

████████████████████████████

████████

████████████████

6  Q    Was it appropriate for a deputy sheriff to

7       be sharing a message like this with

8       yourself and his co-workers?

9  A    To blow off some steam and make fun of each

10      other, you know, so.

11 Q    So does that mean yes, it was appropriate?

12 A    No, it was not appropriate.

13 Q    Did Deputy Norris receive any kind

14      discipline or reprimand as a result of this

15      communication?

16 A    I can't recall if it was on this one.

████████████████████████

████████

██████████████

████████████████

█████████████████

██████████

██████████████████████

████████████

████████████████████

7    Q          ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ based on these couple

8               of pages it looks like it is yourself and

9               someone named Seth Whitaker.  Is he a

10              deputy sheriff?

11   A          Not any more.

12   Q          Okay. Was he back on August 11th of 2021?

13   A          Yes.

17   Q          It looks like you sent him a photo, it is

18              on the second page, showing a building with

19              a big sign that says Mouse's Ear?

20   A          Yes.

21   Q          What is a Mouse's Ear?

22   A          A strip club.

23   Q          Yeah, I googled it and it says that it is

24              strip club in Johnson City; does that sound

25              correct?

1   A       Yes.

2   Q       Have you ever been there?

3   A       Years ago, yes.

█   █       ██████████████████████████

█   █       █████████████████████████

█   █       ███████████████

7   Q       Did you send that to your deputy sheriff

8           because you thought it was funny?

9   A       Yes.

█   █       █████████████████████████

█           ████████████    █████████████

█           ████████████   ████████

█           ██████████████████████████

14  Q       ██████  This to me looks to be a conversation

15          Between yourself, Fields - - Deputy Fields,

16          and Deputy Eckels; is that correct?

17  A       Yes.

18  Q       Okay. And it looks like Jason Eckels sends

19          an image with a joke referencing penis

20          size; is that accurate? Looking at the

21          second page.

22  A       Yes.

█   █       █████████████████████████

█   █       ██████████████████████████

█   █       ██████████████████████████



13    Q    Did you say in this chain that that was

14         funny?

15    A    Yes.

16    Q    Okay. And you were talking about the penis

17         size joke that Deputy Eckels sent; is that

18         correct?

19    A    That is what it says here.

11   Q        ▮    And this looks to be some

12            communications between yourself, Deputy

13            Eckels, and Deputy Norris from my read?

14   A        Yes.

15   Q        So it looks like first the way that I read

16            this you sent a photo of like maybe a Greek

17            statue, some sort of stone statue that is

18            on the page marked 1698?

19   A        Yes.

20   Q        And then, later, you sent another image

21            where it looks to be the same statue, but

22            it has got your face, Deputy Eckels' face

23            and I believe maybe Deputy Norris' face; is

24            that correct?

25   A        Yes.

3   Q      Do you know why that you sent that image to

4          your deputies?

5   A      For blowing off a little steam picking on

6          each other.

7   Q      How are you picking on them in this

8          picture?

9     **MR. SHAW:** Continuing objection to relevance. Go

10     ahead.

11  A      We are just aggravating each other.

7    Q    ████████████████████████████████ Are

8         you saying that James should be the mad one

9         because he is the one that's face is over

10        the penis on this statue?

11   A    Yes, ma'am.

18   Q    ████████████████ on the second page there is

19        an image.  Is that an image that you sent

20        to these persons who you supervise in the

21        Letcher County sheriff's department?

22   A    Yeah, that is what it looks like.

23   Q    Okay. Whose face is that up there?

24   A    Jason Eckels.

25   Q    And just to clarify, was he the person who

1    also pictured over the turtle's head on the

2    last exhibit that we just looked at?

3  A    Yes.

4  Q    Why did you send this to these person who

5    you supervise?

6  A    I thought it was funny.

7  Q    And you wrote, and I am looking at 2040.

8    You wrote I was trying to be respectful,

9    but that is funny. Was you referencing the

10    image that you sent?

11  A    Yes.

13  Q    What kind of example do you think that you

14    were setting for the folks working under

15    you by engaging in this kind of

16    conversation with your sheriff's deputies?

17  A    Horrible.

18  Q    Did those communications that we just

19    looked through did those violate any of the

20    Letcher County sheriff's department's

21    policies that we reviewed earlier?

22  A    Yes.

23  Q    Which ones?

24  A    Conduct.

25  Q    Conduct unbecoming?

```
1    A         Acting professional.

2    Q         At least after those communications we

3              looked through, do you recall there being

4              any discipline or reprimand resulting from

5              any of those communications?

6    A         No documentation.

7    Q         Nothing documented you are saying?

8    A         That is right.
```





10    Q        Do you know Chris Triplett?

11    A        Yes.



25    Q         when did you as Letcher County

1   sheriff first become aware of these

2   allegations against Ben Fields related to

3   Jennifer Hill?

4   A   I don't recall.

5   Q   Okay. If there was a woman who would have

6   picked up the phone at the sheriff's

7   department, do you know who that woman

8   would have been back in December of 2021?

9   A   Christine Bolling or Lashauna Frazier.

10  Q   Okay. And are they sort of office support

11  staff or administrative staff?

12  A   Yes. ███████████████████████████

    ███████████████████

    █████████  ████

    ████████████████

16  Q   ████████████████████  we are still

17  discussing the Chris Triplett report that

18  he describes in his Affidavit to the

19  sheriff's department. Do you recall whether

20  you talked specifically to Deputy Whitaker

21  about whether he ever received a report

22  about sexual misconduct related to Jennifer

23  Hill and Ben Fields?

24  A   I can't recall.

    █  █  ██████████████████████







16    Q       Do you know who Stacy Yates is?

17    A       Yes, I am familiar with him.

██████████████████████████████████

2    Q      Do you see there is some names in paragraph

3           six? Robbie Kincer, do you know who Robbie

4           Kincer is?

5    A      Yes.

6    Q      Who is Robbie Kincer?

7    A      He is the Drug Court coordinator for

8           Letcher County.

9    Q      Would you interact with him on any kind of

10         regular basis in your capacity as sheriff?

11   A      Not regular basis.

12   Q      Well, how often a week would you see him?

13   A      It is not weekly.

14   Q      Okay. Once a month?

15   A      If that.

██████████████████████████████████

19    Q       Would it make sense for Ben Fields to be in

20            a hearing about - - in a drug court

21            session?

22    A       Where does it - -

23    Q       I am looking at paragraph seven.  It says,

24            during this drug court session there was

25            some discussion between Judge Craft and Ben

| | | |
|---|---|---|
| 1 | | Fields regarding the EPO location and |
| 2 | | residence of Sabrina Adkins; do you see |
| 3 | | that? |
| 4 | A | Yes. |
| 5 | Q | I guess that Ben Fields as I understood was |
| 6 | | the district court bailiff? |
| 7 | A | Yes. |
| 8 | Q | But I guess would it make sense for him to |
| 9 | | be discussing with Judge Craft the location |
| 10 | | and residence of someone on home |
| 11 | | incarceration? |
| 12 | A | Yes. |

■ ■ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬
■ ▬▬
■ ■ ▬▬
■ ■ ▬▬▬▬▬▬▬▬▬▬▬▬
■ ▬▬▬▬▬▬
■ ■ ▬

| | | |
|---|---|---|
| 19 | Q | When was the first time that you heard her |
| 20 | | name or met Sabrina Adkins? |
| 21 | A | I don't recall. |
| 22 | Q | Have you met her? |
| 23 | A | I don't recall. |

■ ■ ▬▬▬▬▬

| | | |
|---|---|---|
| 25 | A | When Judge Craft and Robbie reported that |

1    to me in my office that day after the

2    reporter, they also apologized to me,

3    because they did not come to me and tell me

4    all of this earlier.





6   Q   Based on what you said earlier, at some

7       point, you became aware that Robbie Kincer

8       and Judge Craft had some knowledge about

9       Ben Fields; is that correct?

10  A   Yes.

15  Q   Okay. What else did they tell you?

21  A   That they were sorry that they didn't come

22      to me sooner.

23  Q   Did they mention Brianna Cornett at that

24      time?

25  A   Not at that time.

| | | |
|---|---|---|
| 1 | Q | Okay. Did they mention her later? |
| 2 | A | No, they did mention her at that time. |
| 3 | Q | Okay. |
| 4 | A | Yeah, they did mention her at that time. |

5     Q          Where were you when you had this

6                conversation with Robbie Kincer and Judge

7                Craft?

8     A          In my office.

9     Q          So they walked over to your office from the

10               courthouse?

11    A          Yes.

12    Q          Was anybody else present for that

13               conversation?

14    A          Not in my office, no.

4    Q       So this looks like this is a criminal

5            complaint that Ben Fields swore out.

I was just wondering like is there some

sort of process, if I am a deputy sheriff

13           and I am going to go get a criminal

14           complaint, do I have to notify the sheriff

15           before that I do that or was there any sort

16           of - -

17

18    A       No.



| | | |
|---|---|---|
| 1 | Q | ████████████████████████ |
| 2 | | ██ So this says that the offender on home incarceration failed to report to the Letcher County sheriff's office; do you see that? |
| 6 | A | Yes. |
| 7 | Q | And Ben Fields signs this as - - it says Ben Fields, LCSO. Do you see that? |
| 9 | A | Yes. |
| 10 | Q | Is that the designation for Letcher County sheriff's office? |
| 12 | A | Yes. |
| 13 | Q | So you are saying that he would have gone to speak to the county attorney about this complaint, and he would have worked with the county attorney to fill this out. Is that your understanding? |
| 18 | A | He spoke with the county attorney's assistant. |
| 20 | Q | So Angela Trent's signature down there at the bottom? |
| 22 | A | Yes. |
| 23 | Q | And that is one of my questions. Who is Angela Trent? |
| 25 | A | She is a secretary for the county attorney. |

```
1   Q        Okay. So as best you can tell, Ben Fields
2            worked with Angela Trent and swore out this
3            complaint; correct?
4   A        Yes.
5   Q        And looks like this got printed on January
6            14th, and then, if you look at the next
7            page, it looks like this complaint warrant
8            was generated on the 15th. Do you see that?
9   A        Yes.
10  Q        So would you have been aware of the fact
11           that complaint warrant had been generated?
12  A        No, it wasn't generated on the 15th.  You
13           looked at that wrong.
14  Q        Okay. Help me.
15  A        The Judge signed it on the 14th.
```

■  ■        ████████████

■  ■        █████████████████████████████████

■  ■        ████████████████████████████████

■           █████████████████████████

■           █████████████  ██████████

■           ███████████  █████████

```
22  A        ████████████████     the judge signed it on the
23           14th, so it is actually should have been
24           generated then in the computer system.
```

■  Q        ███████████████████████████████

███████████████████████

2  Regardless, would the sheriff's department

3  get a copy of this after the warrant is

4  generated?

5 A No, ma'am.

6 Q So what, if any, involvement with the

7  sheriff's office have with this complaint

8  warrant?

9 A It would go into a computer system.

10 Q ████████████ is the sheriff's

11  department responsible for arresting people

12  and serving warrants?

13 A Yes.

5    Q    ██████  Are there only certain deputies

6          within the Letcher County sheriff's

7          department who have the authority to arrest

8          people?

12   A    Road deputies can arrest on the road, and

13         you know, court and everything, court

14         security is suppose to be court on

15         courthouse grounds.

16   Q    Okay. So Ben Fields only had the authority

17         to arrest people in court and on courthouse

18         grounds; is that correct?

19   A    Yes.

20   Q    So is it fair or is it accurate to say that

21         at least as of the morning of January 15th

22         everyone within the Letcher County's

23         sheriff's office would at least have access

24         to be able to see this complaint warrant;

25         correct?

1    A       It depends on what day it is.







7   Q    You stayed in the office. Did you talk to

8        anybody else during that time period?

9   A    Yeah, I talked to Lashauna Frazier and

10       Christine.

11  Q    What did you all talk about?

12  A    I told them that I had got a call from a

13       reporter and a lawsuit had been filed

14       against Ben.

15  Q    What did they say?

16  A    They were shocked.



10    Q       Did they tell you whether they reported it

11            to anybody before reporting it to you?

12    A       They advised me that they had not reported

13            it to any law enforcement or anybody else.

17    Q       Okay. Did you say earlier that they were

18            apologizing to you?

19    A       Yes.

20    Q       Explain to me how they apologized to you?

21    A       They just said that they were sorry that

22            they didn't come and tell me when they

23            first found out about it.

24    Q       Okay. What did you say to them?

25    A       Yeah, yeah, you should have come and told

1   me. I am the sheriff you know that I am

2   going to want to know that.

19  Q   And then, it looks like at 4:30 sent a text

20      and spoke to somebody Sturgill with KSP?

21  A   Derrick Sturgill.

22  Q   Who is that?

23  A   He is a supervisor with KSP Post 13.

24  Q   That is Hazard; right?

25  A   Yes.



3    Q        ████████████  did you tell him about the

4    report about Ben Fields?

5    A        Yes.





21   Q      So you said met with Ben Fields. Did he

22          actually come to your office that night?

23   A      Yes.

24   Q      Okay. And so who else was present aside

25          from yourself and Mr. Fields?

| | | |
|---|---|---|
| 1 | A | I took him back to my office and shut the |
| 2 | | door. |
| 3 | Q | So there was no witness to this? |
| 4 | A | Uh-uh. |
| 5 | Q | Okay. What did you say to Ben Fields? |
| 6 | A | That the reporter had made some |
| 7 | | allegations, and a lawsuit had been filed |
| 8 | | against him for sexual abuse. |
| 9 | Q | Okay. Did he respond to that? |
| 10 | A | I can't recall what he said. |





1    A        I talked to the county attorney multiple

2             times even when he wasn't at the office I

3             called him.

████  ███  ████████████████████████████████████

████       ████████████████████████████████████████

████       ████████████████████████████

████  ██   ███████████████████████████████████

████       ███████████████████████████████████

████       ████████████████████████████████████████

███        ████████████████████████████████████

███        ████████████████████████████████████

███        █████████████████████████████████████████

███        ████████████████████████████████████████

███        ████████████      I think that is when he said you

15            have to suspend him without pay.

16   Q        And it was your understanding that Ben

17            Fields had kissed Brianna Cornett while she

18            was on home incarceration?

19   A        Yes.

20   Q        So you met with Ben Fields and advised him

21            of the suspension and gave him this

22            memorandum on the 31st of January; correct?

23   A        Yes.

24   Q        And what did he say - - How long did that

25            conversation last?

1    A        It wasn't long.

2    Q        Did he apologize to you?

3    A        Yeah, I think that he did.



11    Q    Did you speak to Patty Stockham at any

12         point on January 31st?

13    A    Yes.

14    Q    Okay. Tell me about that communication?

15    A    I had called her after I suspended Ben and

16         told her that I had got some allegations

17         that he had been having a relationship with

18         some people on house arrest and I had to

19         suspend him without pay.

20    Q    You told Patty Stockham that after your

21         meeting with Ben at 1845?

22    A    Yes.









11    Q        Do you recognize this form?

12    A        Yes.

13    Q        What is this form?

14    A        It is - - We sent in to Kentucky Law

15             Enforcement Counsel that.  Just making sure

16             that I am telling you right; okay?

17    Q        Yeah, sure, sure.

18    A        There is a criminal investigation and

19             suspended without pay.

20    Q        Okay. So is this a form that you have to

21             submit to the Kentucky Law Enforcement

22             Counsel when you put someone on suspension?

23    A        Yes.

24    Q        Okay. Do you see underaction you have

25             checked both boxes under criminal

| | | |
|---|---|---|
| 1 | | investigation and under administrative |
| 2 | | investigation; do you see that? |
| 3 | A | Yes. |
| 4 | Q | Okay. Was there any administrative |
| 5 | | investigation here? |
| 6 | A | Just taking the information that I took |
| 7 | | here, speaking with the county attorney, |
| 8 | | and the commonwealth attorney. I have left |
| 9 | | the commonwealth attorney off my timeline, |
| 10 | | and KSP refused, and that he would get up |
| 11 | | with the AG's office, and they told me that |
| 12 | | they would investigate it.  I can't |
| 13 | | remember. My timeline here is bad, because |
| 14 | | I had such a bad episode.  I can't remember |
| 15 | | the details. |
| 16 | Q | Okay. I guess if anyone performed an |
| 17 | | administrative investigation aside from |
| 18 | | yourself, who would that have been? |
| 19 | A | It would have just been me. |
| 20 | Q | And as far as the administrative |
| 21 | | investigation that you conducted, is it |
| 22 | | documented on this piece of paper marked |
| 23 | | exhibit 22? |
| 24 | A | Yeah, mostly, yes. |
| 25 | Q | Okay. What other documents might exist that |

1         document your investigation?

2 A     I don't have any other documents.

3 Q     Okay. It looks like you signed this on

4         February 2nd of 2022; do you see that at the

5         bottom?

6 A     Yes.

7 Q     And then, it was the next day on February

8         22nd that you decided to terminated Fields;

9         is that correct? I have got a document here

10         and this is what was produced in discovery

12    Q        [redacted] So you gave

13             this letter to Ben Fields on February 2nd;

14             is that correct?

15    A        Yes, that is what the date shows on the

16             page.

17    Q        Yeah, so did you do that before or after

18             you spoke with Bert Slone?

19    A        It was after.

20    Q        Did you consult with the commonwealth

21             attorney and county attorney in deciding to

22             terminate Ben Fields?

23    A        So what I left off was February the 1st.

24    Q        So what happened on February the 1st?

25    A        I remember that I spoke with county,

```
1    commonwealth attorney.

2    Q    Okay. Anybody else?

3    A    I think Judge Mullins and Bert Slone at the

4         courthouse.
```

██████████████████████████

████████████████████████████

███

██████████████████████████████

██████████████████████████

████

████████████████████████

██████████████████████████████

█████████████████████████████

███████████████████

█████████████████████████

██████

████  █████████████████████████████████

█████████████████

```
19   Q    What about conversations that you had with

20        the commonwealth attorney on February 1st?

21   A    When I talked to the commonwealth attorney,

22        we talked about the AG's office

23        investigating it and he would get them to

24        come in and investigate it.
```

██████







13   Q     Okay. And then, at some point on February

14        2nd, you handed Ben Fields his termination

15        notice

16   A     Yes.

19   Q          And so where did that exchange occur?

20   A     It was outside the courthouse in the

21        parking lot of the funeral home beside the

22        courthouse.







**MR. WILLIAMS:**

Q    Sheriff, I tried to listen carefully today while that you testified about various meetings and discussions that you have had, so I want to just limit my questions to those conversations that you had with Ben Fields after that you learned of the allegations; okay?

A    Okay.

Q    So I understand that it sounds like at least on a couple of occasions that Ben came to your office and you had some conversation with him and the last one being, I guess, where he was handed a termination letter?

A    Yes.

Q    And as I understood your testimony, it sounded like you had great difficulty recalling anything that Mr. Fields said in particular in any of those meetings?

A    Yes.

Q    You made reference to at one point he might have said something to the effect what others; do you recall that testimony?

```
1    A       Yes.

2    Q       Are you even sure that he said that?

3    A       At the time, I mean I  was really sick and

4            everything going on, I am pretty sure that

5            is what he said to me.

6    Q       Okay. As I heard you testify about it, that

7            as the only words from him that you could

8            recall at any time saying?

9    A       Yes.

10           MR. WILLIAMS: Thank you. I have no further

11           questions.
```

█    ████████    ██████████████████████████████

█    ██████████████████████████████████████████

█    ███████████████████████████████

```
15

16

17

18

19

20

21

22

23

24

25
```

## CROSS EXAMINATION

MR. SHAW:

Q        Sheriff, I am going to feed you a couple of
         documents. One is the Ben Fields Oath.  Is
         that in his personnel file?

A        Yes.

Q        Are all deputies are they sworn in? Do they
         have a written oath as part of their
         personnel file?

A        Yes.

         **MR. SHAW:** I would like to mark that as Defense
         1.

Q        I have various documents from the Kentucky
         Law Enforcement Cabinet. It looks like it
         was signed by Sheriff Danny Webb at four
         pages when Mr. Fields was first hired, and
         I ask that we redact out the date of birth
         and social security number from these
         records. Does that look accurate?

A        Yes.

         **MR. SHAW:** I would like to attach that as defense
         2.



REPORTER'S CERTIFICATE

STATE OF KENTUCKY

COUNTY OF JOHNSON

  I, Joey VanHoose, Stenographer and Notary Public, and for the State of Kentucky at Large, do certify that the foregoing deposition of Mickey Stines was taken at the place, on the date and for the purposes stated in the Caption and that the appearances were as noted herein.

  FURTHER, I certify that that witness was duly sworn by me before testifying; that the testimony was reported by me in steno notes and electronically recorded; and thereafter, I constitute a true, correct and complete transcript of my said shorthand notes as could be heard and understood by me.

  GIVEN under my hand at Paintsville, Kentucky, this 23rd day of September, 2024.

  My Commission Expires August 1, 2026.

_____

Joey VanHoose

KYNP53570